## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEDDO COAL COMPANY,                    :
                                       :
        **Plaintiff,**              :
                                       :
    **v.**                        :       **3:16-CV-621**
                                       :       **(JUDGE MARIANI)**
RIO TINTO PROCUREMENT                  :
(SINGAPORE) PTE LTD, et al.,           :
                                       :
        **Defendants.**            :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

The above captioned matter arises out of a dispute regarding a multi-year installment contract for the provision of coal. Plaintiff, Jeddo Coal Company, filed a Complaint, (Doc. 1), on April 14, 2016, seeking damages for an anticipatory breach of contract (Count I), and breach of contract (Counts II, III, & IV). Plaintiff also seeks a declaratory judgment that the contract's damages provision is enforceable (Count V). Presently before the Court is a Motion to Dismiss, (Doc. 14), filed by defendant Rio Tinto Procurement (Singapore) PTE LTD ("Rio Tinto"), as well as defendants Rio Tinto Fer et Titane Inc., Rio Tinto Alcan Inc., and High Purity Iron Inc. (collectively "Relevant Companies"). Rio Tinto and the Relevant Companies (collectively "Defendants") seek complete dismissal of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] The parties have briefed the Motion

---

[1] Defendants also argue that one named party, Quebec Metal Powders LTD ("QMP"), should be dismissed from this action because it ceased to exist after it merged with its parent corporation Rio Tinto

to Dismiss and it is now ripe for decision.[2]  For the following reasons the Court will deny

Defendants' Motion to Dismiss except as it pertains to Quebec Metal Powders LTD.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint alleges the following facts:

In 2011, Plaintiff entered into a multi-year installment contract for the provision of

coal ("Original Agreement").  (Doc. 1 at ¶¶ 3-4, 16).  The Original Agreement was signed by

Plaintiff and by Rio Tinto "on its own behalf and as agent severally on behalf of each of the

Relevant Companies."  (*Id.* at ¶¶ 18-19).  "Relevant Companies" was defined in the Original

Agreement as Rio Tinto Fer, and Rio Tinto Alcan.  (*Id.* at ¶ 19).  The Original Agreement

provided that between 2013 and 2016, Rio Tinto, Rio Tinto Fer, and Rio Tinto Alcan would

collectively purchase 72,000 tons of coal per year from Plaintiff.  (*Id.* at ¶¶ 3, 16, 23).

In 2012, Rio Tinto, Rio Tinto Fer, and Rio Tinto Alcan collectively purchased 72,000

tons of coal at the Original Agreement price.  (*Id.* at ¶ 25).  In 2013, however, they informed

Plaintiff that they would no longer purchase coal under the Original Agreement.  (*Id.* at ¶

26).  In response, Plaintiff agreed to modify the Original Agreement's price and quantity

schedules.  (*Id.* at ¶ 27).  Consequently, in 2014, Plaintiff and Rio Tinto, Rio Tinto Fer, and

Rio Tinto Alcan executed a "Variation Agreement" that modified the Original Agreement.

---

Fer et Titane in 2013. (Doc. 18 at 8-9).  Plaintiff has agreed to dismiss its claims against QMP, but has reserved the right to rejoin QMP as a party, if warranted, based on information learned in discovery.  (Doc. 19 at 2-3 n.1).  Accordingly, the Court will dismiss the complaint without prejudice as it pertains to QMP.

[2] Defendants' Motion requested oral argument on this matter.  (Doc. 14).  At a subsequent case management conference, however, Defendants clarified that they only requested oral argument in case the Court had questions or wanted to hear argument.  After reviewing the filings, the Court finds that oral argument is unnecessary.

(*Id.* at ¶ 28). In addition to modifying price and quantity schedules, the Variation Agreement added High Purity Iron as a "Relevant Company," and extended the contract term to from 2016 to 2019. (*Id.* at ¶¶ 4, 27-28, 30). The Variation Agreement also contained the following clause:

> From 1 January 2014, if the Rio Tinto Party takes delivery of less tonnage than indicated in Schedule B, Clause 2 as amended, in any Contract Year, Rio Tinto Party will pay the Supplier the equivalent of the greater of:
> i.     the Supplier's lost gross profit (defined as the contract reference price for 9% ash less direct costs); and
> ii.    US$30.
> for each ton of Product not taken.

(Doc. 1 at ¶ 46; Doc. 1-16 § 3(e)). Except as modified by the Variation Agreement , the Original Agreement remained in place. (*Id.* at ¶ 31). Collectively, these agreements formed the "Amended Agreement" or simply the "contract."

The Amended Agreement is composed of a number of documents. According to the contract, there is a hierarchy within the documents, so that if there is a conflict among them, certain documents prevail over others. (Doc. 1-4 at § 2.2(a)). The hierarchy is as follows:

1. Variation Agreement;

2. Agreement Form;

3. Schedule F (Special Conditions);

4. Schedule E (Site Specific Terms);

5. Schedule A (General Conditions);

6. Schedule H (Relevant Companies);

3

7. Schedule B (Products and Specifications);

8. Schedule C (prices);

9. Schedule D (Delivery Schedule);

10. Schedule G (Late Charges)

11. Any other documents attached or referred to in the agreement

(Doc. 1-16 § 5; Doc. 1-4 at § 2.2(a)).

All parties performed under the contract without incident in 2014 and 2015. (Doc. 1 at ¶ 57). In 2016, the contract called for Defendants to purchase 44,000 net wet tons of coal. (*Id*. at ¶ 40). On December 18, 2015, Rio Tinto wrote a letter informing Plaintiff that "[u]nexpected and unforeseeable market conditions" had placed pressure on Rio Tinto's business and stating that it "would like to commence a discussion to review the Agreement to reflect the current business outlook for" Rio Tinto. (*Id*. at ¶¶ 58-61; Doc. 1-17 at 1). Representatives of Plaintiff and Rio Tinto then spoke by phone, and Rio Tinto informed Plaintiff that, because of price considerations, Rio Tinto was not inclined to purchase coal from Plaintiff in 2016. (Doc. 1 at ¶¶ 62-63).

On February 18, 2016, Plaintiff sent a follow up letter where it sought "to determine [Rio Tinto's] intentions regarding its contractual commitment with [Plaintiff] for the 2016 shipping season." (Doc. 1-17 at 2; Doc. 1 at ¶ 69;). On March 4, 2016, Plaintiff sent another letter to Rio Tinto in which it sought payment for 8,800 tons of coal for which Plaintiff had already sent an invoice to Defendants. (Doc. 1 at ¶ 72-73; Doc. 1-17 at 4). In

4

the same letter, Plaintiff also stated that, if Rio Tinto did not plan to purchase coal in 2016,

Plaintiff "expect[ed] to receive the $30 per ton 'take or pay' compensation provided" for in

the contract. (Doc. 1-17 at 4; Doc. 1 at ¶ 72-74). By letter dated March 8, 2016, Rio Tinto

stated that

> the business conditions facing us now are particularly bad and we do not
> expect to be able to take product from you while those conditions persist.
> Naturally it is beyond our ability to know or predict for how long those
> conditions will last, but, as it stands, we will not be able to take product from
> you in 2016. . . .
>
> . . .
>
> As to the invoice for the stored product and storage fees, we were obviously
> very surprised to receive it after telling you that we could not take product this
> year.

(Doc. 1-17 at 6; Doc. 1 at ¶¶ 75-77).

On March 9, 2016, Plaintiff responded with a letter "formally demand[ing] payment of

the sums we are owed under the Contract for the 2016 Shipping season" and attaching

invoices for payment. (Doc. 1 at ¶¶ 79-81; Doc. 1-17 at 8-13). By letter dated Mach 31,

2016, Rio Tinto stated that "[g]iven our clear, early indication that we would not take

tonnage in 2016, your peremptory issuing of the invoices is not in the spirt of our

relationship and we had hoped to have greater cooperation and appreciation of our difficult

position." (Doc. 1 at 82-84, 86; Doc. 1-17 at 14). It went on to dispute the amounts Plaintiff

claimed, including stating that it was Rio Tinto's "view that the $30 per ton is a penalty,

being disproportionate to the loss [Plaintiff] would incur." (Doc. 1 at 84-85; Doc. 1-17 at 15).
Plaintiff then initiated the present lawsuit on April 14, 2016.

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it
does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*
*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A
claim has facial plausibility when the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement
to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of
action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations
omitted). In other words, "[f]actual allegations must be enough to raise a right to relief
above the speculative level." *Id.* A court "take[s] as true all the factual allegations in the
Complaint and the reasonable inferences that can be drawn from those facts, but . . .
disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*,
707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to
> determine the sufficiency of a complaint: First, the court must take note of the

6

> elements a plaintiff must plead to state a claim. Second, the court should
> identify allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth. Finally, where there are well-pleaded
> factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and

quotation marks omitted). This "plausibility" determination will be a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. ANALYSIS

Defendants first contend that the Complaint should be dismissed in its entirety as it

pertains to the Relevant Companies and then further argues that each count of the

Complaint is individually subject to dismissal. Because many of the arguments Defendants

put forward involve the interpretation of the contract, the Court will begin with some general

legal principles that will shape its decision.

In Pennsylvania, "[t]o successfully maintain a cause of action for breach of contract

the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a

breach of a duty imposed by the contract, and (3) resultant damages." *Hart v. Arnold*, 884

A.2d 316, 332 (Pa. Super. Ct. 2005). "It is well established that the intent of the parties to a

written contract is to be regarded as being embodied in the writing itself, and when the

words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). "Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." *Huegel v. Mifflin Const. Co.*, 796 A.2d 350, 354-55 (Pa. Super. Ct. 2002) (quoting *Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super. Ct. 1957)).

## A. Relevant Companies

Defendants first argue that the Relevant Companies should be dismissed from the action entirely because, by the terms of the contract, only Rio Tinto is obligated to purchase coal from Plaintiff. (Doc. 18 at 6). Defendants point to several provisions in the contract that they contend support their interpretation. (*Id.* at 6-8). Plaintiff's rebuttal points to different provisions in the contract which it argues shows that Rio Tinto and the Relevant Companies had a collective obligation to purchase coal under the contract. (Doc. 19 at 7-8). Plaintiff also argues that, if the contract does not unambiguously bind the Relevant Companies to buy coal, it is at least ambiguous and thus cannot be decided as a matter of law. (*Id.* at 8).

The Agreement Form states that "Rio Tinto hereby appoints Supplier [Jeddo], and Supplier hereby accepts such appointment, as a duly qualified supplier of the Products to Rio Tinto on the terms and conditions set out in this Agreement." (Doc. 1-3 at 3). It further

8

says that "this benefit and other covenants and agreements of Rio Tinto contained herein

constitute full and adequate consideration for the entering into of this Agreement by"

Plaintiff. (*Id.*). Rio Tinto signed the Original Agreement "on its own behalf and as agent

severally on behalf of each of the Relevant Companies." (*Id.*). Schedule F, Section 13,

replaces Section 9 in Schedule A with the following:

**9      No purchase commitment**
   (i)     Nothing in the Agreement (a) obligates Rio Tinto or a Relevant
           Company or an End User to purchase any specified volume,
           market share, requirements or minimum level of product,
           unless expressly provided otherwise in Section 9(ii) . . . .
   (ii)    . . . the Supplier will sell and deliver to the Rio Tinto Parties . . .
           and the Rio Tinto Parties will purchase from Supplier, Products
           (a) at the Prices specified in Schedule C and (b) in one or more
           deliveries . . . .

(Doc. 1-13 at 3). "Rio Tinto Parties" is defined in the contract as "Rio Tinto and the Relevant

Companies." (Doc. 1-4 at 10). Schedule H, as amended by the Variation Agreement,

defines the Relevant Companies as QIT Fer et Titane Inc.,[3] Rio Tinto Alcan Inc., and High

Purity Iron Inc. (Doc. 1-15 at 1; Doc. 1-16 at 4).

Schedule A also states:

**1.4      Relationship of Rio Tinto and the Relevant Companies**
        The Parties acknowledge and agree that:
   (a)    Rio Tinto will have no obligation to perform on behalf of any
          Relevant Company under the Agreement or any Purchase
          Order; and

---

[3] QIT Fer et Titane Inc. subsequently changed its name to Rio Tinto Fer et Titane Inc. (Doc. 1-16 at 1).

9

(b)     a Relevant Company will have no obligation to perform on behalf of Rio Tinto or any other Relevant Company under the Agreement or any Purchase Order.

## 1.5     Capacity of Relevant Companies

Where Schedule H specifies that a Relevant Company enters into, and is a party to, the Agreement on behalf of any other entity, then:

(a)     that Relevant Company is a Party to the Agreement for each such entity in the capacity specified in Schedule H.

. . .

## 3.1     Purchase Orders

When a Relevant Company elects to purchase Products, it will issue a Purchase Order to the Supplier . . .

(Doc. 1-4 at 2). The Termination Clause, found in Section 16.2 of Schedule A, provides that

Rio Tinto and Plaintiff have the authority to "terminate, in whole or in part, the Agreement or

any Purchase Order" if certain conditions are met, while the Relevant Companies only have

the authority to "terminate a Purchase Order to which that Relevant Company is a Party" if

certain conditions are met. (Id. at 6). Finally, the background section of the Variation

Agreement states that "Rio Tinto and the Supplier are parties to the" Original Agreement.

(Doc. 1-16 at 1).

Defendants point to the general language in the Agreement Form, the background

section of the Variation Agreement, and Sections 1.4, 3.1, and 16.2 of Schedule A as proof

that only Rio Tinto is obligated under the contract to buy coal. (Doc. 18 at 6-8). Plaintiff

primarily relies on the provisions in Schedule F to support its position that Defendants are

collectedly obligated to buy coal. (Doc. 19 at 7-8). After reviewing the provisions of the

10

contract, Plaintiff's allegations, taken as true for purposes of determining the legal sufficiency of its Complaint, state a plausible claim of breach of contract.

Both the Agreement Form and the Variation Form are signed by Rio Tinto "on its own behalf and as agent severally on behalf of each of the Relevant Companies." Thus, the Relevant Companies appear to be parties to the contract. Within the contract, Schedule F specifically states that the "Rio Tinto Parties," which include all Defendants, "will purchase" coal from Plaintiff. Due to the hierarchy of the documents within the contract, in the event of a conflict Schedule F takes priority over all other documents except the Agreement Form and the Variation Agreement. (Doc. 1-16 § 5; Doc. 1-4 at § 2.2(a)). Thus, Plaintiff has sufficiently stated a cause of action against Rio Tinto and the "Relevant Companies."

The provisions in the two documents that do take priority over Schedule F similarly provide Defendants no help. In the Agreement Form, Defendants point to the language that states that Plaintiff is the supplier of coal "to Rio Tinto." (Doc. 18 at 6). This, however, does not necessarily mean that other entities are not bound to purchase coal under the contract. Equally, the general statement that "this benefit and other covenants and agreements *of Rio Tinto*" constitute adequate consideration for the Original Agreement does not necessarily mean that other entities are not bound to purchase coal under the contract.

Defendants also argue that the Variation Agreement acknowledges that Rio Tinto and Plaintiff are the only parties to the Original Agreement. The contract language, however, states that "Rio Tinto and the Supplier *are parties to* the" Original Agreement. It

does not state that they are the *only* parties to the Original Agreement. Finally, in their reply

brief, Defendants also cites to the damages provision found in the Variation Agreement

which provides:

> Compensation calculated in accordance with this Clause will be the sole
> compensation to which the Supplier is entitled for *Rio Tinto's* failure to take
> the tonnage listed in Schedule B, Clause 2 as amended, in any Contract Year
> and the Supplier hereby agrees to forego all other types and kinds of payment
> or compensation on whatsoever basis and howsoever calculated. *Rio Tinto*
> will not be liable to pay any compensation of any kind if its failure to take
> delivery of the tonnage set out in Schedule B, clause 2, as amended, for such
> Contract Year is caused by the Supplier's inability to make the Product
> available for whatever reason (including Force Majeure) or because of Force
> Majeure affecting the Rio Tinto Party.

(Doc. 1-16 at 4) (emphasis added). This provision is not a clear enough indication of the

parties' intentions as to overcome the other contract language that states that the Relevant

Companies are party to the contract and that they, in combination with Rio Tinto, "will

purchase" coal from Plaintiff.

In the end, Defendants have failed to cite a clear statement that the Relevant Parties

have no obligation to buy coal under the Amended Agreement. Plaintiff has therefore

adequately pleaded a cause of action against Defendants under the plausibility standard of

*Iqbal/Twombly*. Thus, the Court will deny Defendants' Motion to Dismiss on this basis.

## B. Count I

Defendants next argue that Count I of the Complaint should be dismissed because

Plaintiff has not adequately pleaded Defendants' anticipatory repudiation of the contract.

(Doc. 18 at 9). In a contract for the sale of goods, "[w]hen either party repudiates the

contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . resort to any remedy for breach . . ." 13 Pa. C.S.A. § 2610(2). "[T]o constitute anticipatory breach under Pennsylvania law there must be 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.*, 489 A.2d 733, 736 (Pa. 1985) (quoting *McClelland v. New Amsterdam Cas. Co.*, 185 A. 198, (1936)); *see also Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178, 184 (Pa. 2015).

There are four written statements, contained in letters and incorporated into the Complaint, which could arguably be considered an anticipatory reputation of the contract by Defendants:

1. In the March 8, 2016, letter, Rio Tinto wrote "the business conditions facing us now are particularly bad and we do not expect to be able to take product form you while those conditions persist." (Doc. 1-17 at 6).

2. In that same letter, Rio Tinto wrote "[n]aturally it is beyond our ability to know or predict for how long those conditions will last, but, as it stands, we will not be able to take product form you in 2016." (*Id.*).

3. In that same letter, Rio Tinto wrote "[a]s to the invoice for the stored product and storage fees, we were obviously very surprised to receive it after telling you that we could not take product this year." (*Id.*).

4. In a March 31, 2016, letter, Rio Tinto wrote "[g]iven our clear, early indication that we would not take tonnage in 2016, your preemptory issuing of the invoices is not in the spirit of our relationship and we had hoped to have greater cooperation and appreciation of our difficult position." (Doc. 1-17 at 14).

Defendants argue that none of these statements constitute an "absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so."[4] (Doc. 18 at 11-12). Defendants argue that, in the context of the whole letters, Rio Tinto was expressing that they would not be able to perform under the contract while their current business conditions persisted, but did not express a refusal to perform in the event the business conditions changed. (Id.).

At this early stage, however, Plaintiff has adequately pleaded an anticipatory breach. Although the first statement is somewhat equivocal, Plaintiff has pointed to three other statements where Defendants wrote that they would not or could not purchase coal from Plaintiff in 2016. None of these three statements is accompanied by any qualifications, exceptions, or equivocations; they simply state that Defendants would not or could not take any coal in 2016. "A statement by a party that he will not or cannot perform in accordance with agreement creates [an anticipatory] breach." *Oak Ridge Const. Co. v. Tolley*, 504 A.2d

---

[4] Defendants also make two arguments concerning the remaining time that they had to perform under the contract. (Doc. 18 at 10-11). This, however, is irrelevant. If Defendants did express their unequivocal refusal to perform, it makes no difference how much time they had left under the contract to perform. 13 Pa. C.S.A. § 2610(2) gives Plaintiff the right to resort to remedies for breach at the time of the anticipatory breach.

1343,1346 (Pa. Super. Ct. 1985) (quoting *Jonnet Dev. Corp. v. Dietrich Indus., Inc.*, 463

A.2d 1026, 1031 (Pa. Super. Ct. 1983)).

Next, Defendants argue that even if Plaintiff has adequately pleaded an anticipatory

breach in 2016, it has failed to allege facts entitling it to recover damages for the 2017-2019

contract years. (Doc. 18 at 12). Pennsylvania law defines an installment contract as "one

which requires or authorizes the delivery of goods in separate lots to be separately

accepted, even though the contract contains a clause 'each delivery is a separate contract'

or its equivalent." 13 Pa. C.S.A. § 2612(a). "Whenever nonconformity or default with

respect to one or more installments substantially impairs the value of the whole contract

there is a breach of the whole." *Id.* at. § 2612(c). The determination of whether a default

has sustainably impaired the value of the whole contract "call[s] for examination of all of the

facts of the case." 13 Pa. C.S.A. § 2612 Pa. Bar Ass'n Notes (1953).

Here, Plaintiff has adequately pleaded that Defendants committed an anticipatory

breach by refusing to purchase coal in 2016 for a contract that required Defendants to

purchase coal every year for years 2013-2019. Defendants argue that this alone cannot

constitute "substantial impairment" as the quantities of coal at issue for the 2016 calendar

year only represent 14.7% of the entire contract. (Doc. 18 at 13). Defendants, however cite

no case law for their proposition. At this early stage, the Court cannot say, as a matter of

law, that Defendants' alleged refusal to perform for one year on a seven year installment

contract does not substantially impair the value of the whole contract. To do so before the

facts are developed would not enable the prescribed "examination of all of the facts of the case."

In their reply brief, Defendants argue that Plaintiff's position on the contract's damages clause contradicts Plaintiff's position that the contract is substantially impaired. (Doc. 20 at 8). According to their argument, because Plaintiff maintains that the damages clause is in place to make Plaintiff whole in the event that Defendants fail to purchase the yearly contract amount of coal, any failure on the part of Defendants to purchase coal in a given year cannot substantially impair the contract. (Id. at 8-9). Even assuming that Plaintiff's claims cannot coexist, dismissal would still not be warranted at this stage. Federal Rule of Civil Procedure 8(d)(3) states that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Therefore, inconsistencies between Plaintiff's claims do not subject them to dismissal at the pleading stage. See Slemmer v. McGlaughlin Spray Foam Insulation, Inc., 955 F. Supp. 2d 452, 464 (E.D. Pa. 2013) (allowing two inconsistent claims to proceed past a motion to dismiss).

Accordingly, the Court will deny Defendants' Motion to Dismiss as it pertains to Count I of Plaintiff's Complaint.

## C. Count II and III

Defendants next argue that Counts II and III of Plaintiff's Complaint should be dismissed. (Doc. 18 at 14). Count II of Plaintiff's Complaint is for breach of contract due to Defendants' alleged failure to pay for coal that Plaintiff stored on its premises pursuant to

the terms of the contracts. (Doc. 1 at ¶¶ 98-104). Count III seeks damages for Defendants'

alleged failure to pay the storage fees associated with Plaintiff storing the coal. (*Id.* at ¶¶

105-113). Defendants point out that, under the contract, certain requirements need to be

met in order for the coal stored on Plaintiff's premises to be considered "stored product" and

be compensable. (Doc. 18 at 14). Defendants further argue that Plaintiff has not

adequately alleged these preconditions. (*Id.* at 14-15).

Defendants cite *Chemtech International, Inc. v. Chemical Injection Technologies,*

*Inc.* for the proposition that "[a] complaint that alleges a breach of contract without averring

compliance with conditions precedent does not state a valid breach of contract claim." 247

F. App'x 403, 405 (3d Cir. 2007). Defendants neglect, however, to make reference to what

this Court finds is an important qualifying footnote appearing directly after this quote:

> Chemtech's reliance on Fed.R.Civ.P. 9(c) is misplaced. It is true that under
> Rule 9, it is sufficient to aver generally that all conditions precedent have
> occurred. The deficiency here, however, lies not in Chemtech's failure to
> identify the conduct establishing satisfaction of the Agreement's renewal
> preconditions at the requisite level of detail, but in the omission of any
> allegation that the two conditions precedent occurred at all.

*Id.* at 405 n.1. Indeed, Federal Rule of Civil Procedure 9(c) provides that "[i]n pleading

conditions precedent, it suffices to allege generally that all conditions precedent have

occurred or been performed."

Schedule B, Section 9 of the contract addresses storage:

> Supplier shall have the right to store Product on its premise [sic] prior to
> initiation of the Shipping Season (as defined in Schedule D) ("**Stored**
> **Product**"), up to a maximum of 20% of the Annual Contracted Quantity and

subject to Schedule C, Clause 3. The Relevant Company shall purchase the Stored Product upon initiation of storage. . . . The daily production rate of Stored Product will vary between fifty (50) wet net tons and one hundred and fifty (150) wet net tons ("**Daily Production Lot**")[.] Each Daily Production Lot shall be sampled and analyzed by Supplier in the presence of Associated Commodities and if any Daily Production Lot does not meet the Specifications, it shall be rejected by the Relevant Company. A certified survey confirming the quantity of Stored Product, the Daily Production Lot analyses referred to above and documentation confirming the transfer of title in the Stored Product to the the [sic] Relevant Company (but not the risk of loss or damage) shall accompany all Invoices for Stored Product.

(Doc. 1-5 at 6). Further, Section 3 of Schedule C states:

The Rio Tinto Party will pay a storage fee of US$3.00 per net wet ton of Stored Product (as defined in Schedule B) stored by Supplier prior to the start of the Shipping Season (as defined in Schedule D). Notwithstanding the actual amount of Stored Product stored during any calendar year, the maximum annual quantity to which the Supplier may apply a storage fee is 20% of the tonnage delivered to the Rio Tinto Parties during that calendar year.

(Doc. 1-10 at 2).

Defendants argue that Plaintiff has not pleaded that it has complied with the requirements found in Schedule B to establish that the coal it stored qualifies as "stored product" under the contract. (Doc. 18 at 14-15). Even assuming that Defendants' interpretation of the contract is correct and that the sampling and survey requirements are conditions precedent to Plaintiff's payment, these counts are not subject to dismissal. In both Counts II and III Plaintiff has pleaded that it "has complied with all of the conditions precedent to its entitlement to such payment." (Doc. 1 at ¶¶ 103 & 112). Under Rule 9(c), this is all that is required. See *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F.

18

Supp. 2d 552, 562 (D.N.J. 2002) (denying a motion to dismiss when a party had "generally averred" that it fulfilled a condition precedent); *Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Grp., Inc.*, 2006 WL 2788369, at \*6 (D.N.J. 2006) (finding that the plaintiff's statement in its complaint that it had "fully performed all of its obligations under the Subcontract" was sufficient to plead that it had met all the conditions precedent under the contract). Accordingly, Count II and III are adequately pleaded.

In their reply brief, Defendants argue that Rule 9(c) does not save Plaintiff's claim. (Doc. 20 at 10). Defendants rely on the general legal principal that "[w]here there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994). The disparity that Defendants identify is that the invoices for the stored product that Plaintiff attached to the Complaint do not contain a survey as required by the contract. (Doc. 20 at 10; Doc. 1-17 at 10-13).

As discussed above, however, the contract provides that "a certified survey confirming the quantity of Stored Product . . . shall *accompany* all Invoices for Stored Product." (emphasis added). Plaintiff has generally pleaded that it "has complied with all of the conditions precedent to its entitlement to such payment." This is sufficient under Rule 9(c) to plead that Plaintiff sampled the stored product and sent the survey along with the invoices—assuming, of course, that these actions are actually conditions precedent to payment. Thus, the only "disparity" that Defendants can identify is that Plaintiff chose to

attach the invoices to its Complaint, but not the surveys.  This fact alone, however, is not grounds for dismissal.  Nothing contained in the invoices show that the stored product was not sampled or show that surveys did not accompany the invoices.  (Doc. 1-17 at 10-13).  For the Court to make a determination that Plaintiff failed to satisfy certain conditions of the contract would require an examination of facts outside of the pleadings and the attached documents.  At the motion to dismiss stage, the Court cannot do this.  *See Video Pipeline, Inc.*, 210 F. Supp. 2d at 562 ("Plaintiff's blanket assertion that defendant has failed to satisfy this [contractual] condition calls for consideration of facts extrinsic to the pleadings and therefore beyond the scope of this Rule 12(b)(6) motion.").

Accordingly, the Court will deny Defendants' Motion to Dismiss Counts II and III of Plaintiff's Complaint.

### D. Count IV

In Count IV of the Complaint, Plaintiff has alleged that Defendants have breached the contract by failing to agree on a delivery schedule as required by the Amended Agreement.  (Doc. 1 at ¶¶ 114-118).  Defendants argue that this claim should be dismissed because the contract contains no obligation to agree on a delivery schedule.  (Doc. 18 at 16).

Schedule D of the contract states:

Supplier shall deliver the Rio Tinto Parties' annual order of Product during the period in which the St. Lawrence River in the Province of Quebec is free from ice and other adverse weather conditions, normally between March and November of each calendar year (the "**Shipping Season**") in accordance with

delivery schedule(s) agreed to between Supplier and the applicable Rio Tinto Party prior to the commencement of the Shipping Season.

(Doc. 1-11).  Plaintiff has asserted that this provision presupposes that the parties will agree on a delivery schedule.  Thus, Plaintiff has sufficiently alleged a breach of Section D. Consequently, the Court will not dismiss the claim.[5]

Defendants, in their reply brief, argue that if there is indeed an obligation under the contract to agree to a delivery schedule, the claim should still be dismissed because it is an unenforceable "agreement to agree." (Doc. 20 at 12).  Defendants rely on the legal principal that "[a]n agreement to agree is incapable of enforcement, especially when it is stipulated that the proposed compact shall be mutually agreeable." *Onyx Oils & Resins v. Moss*, 80 A.2d 815, 816 (Pa. 1951).  This doctrine, however, is not applicable to these facts.  In Pennsylvania, the "agreement to agree" doctrine has only been used to determine if a contract exists at all.  *See, e.g., Id.*; *Highland Sewer & Water Auth. v. Forest Hills Mun. Auth.*, 797 A.2d 385, 390 (Pa. Commw. Ct. 2002).  It has not been used to invalidate individual provisions of an otherwise enforceable contract.

Indeed, the doctrine is only applicable when the parties only have an agreement to agree on the essential terms of the contract.  *See Trowbridge v. McCaigue*, 992 A.2d 199, 202 (Pa. Super. Ct. 2010) (finding that "in *Highland*, the court specifically held that the trial

---

[5] The Court, for the same reasons, rejects Defendants argument that there has been no breach because the shipping season still remains open and therefore there is still time for Defendants to agree on a shipping schedule. (Doc. 18 at 16).  The contract seems to presume the agreement on a delivery schedule will occur "prior to the commencement of the Shipping Season." Further, as of this writing, the 2016 shipping seasons has ended.  Thus, if there is an obligation to agree on a delivery schedule, it would appear that the timing of that obligation has passed.

21

court did not err in concluding that no express contract arose from the parties' conduct because they had 'indicated an intention to agree upon *essential terms* in the future.' . . . In contrast, the Agreement here does not indicate an intention to agree upon any essential terms in the future.") (emphasis original).  Here, Defendants do not contend that there is not an enforceable agreement between the parties or that there was never an agreement on the essential terms of the contract.  Instead, they seek to invalidate a single provision of an otherwise detailed contract.  As Defendants have not cited a reported case in Pennsylvania where the doctrine was used to invalidate an individual provision of an otherwise enforceable contract, the Court rejects Defendants' argument.

Finally, Defendants argue that this count should be dismissed because Plaintiff cannot prove damages attributable to the failure to set a delivery schedule.  (Doc. 18 at 16-17).  To make such a determination now would require a fact based inquiry that far exceeds what is appropriate on a motion to dismiss.  Indeed, Defendants argue in their brief that "Plaintiff has not *established any evidence* of damages attributable to the alleged failure to set a delivery schedule."  (Id. at 16) (emphasis added).  At this stage, however, Plaintiff does not need to establish evidence of anything.  Plaintiff need only plead a plausible claim for relief, which it has done.

Accordingly, the Court will deny Defendants' Motion to Dismiss Count IV of Plaintiff's Complaint.

## E. Count V

Count V of Plaintiff's Complaint seeks a declaratory judgment as to whether the

damages clause of the contract is enforceable. (Doc. 1 at ¶¶ 119-122). As discussed

above, the Variation Agreement contained the following clause:

> From 1 January 2014, if the Rio Tinto Party takes delivery of less tonnage
> than indicated in Schedule B, Clause 2 as amended, in any Contract Year,
> Rio Tinto Party will pay the Supplier the equivalent of the greater of:
>   i.    the Supplier's lost gross profit (defined as the contract
>         reference price for 9% ash less direct costs); and
>   ii.   US$30.
> for each ton of Product not taken.

(Doc. 1-16 § 3(e)). Defendants seek to dismiss Count V on the basis that it is not yet ripe.

(Doc. 18 at 17).

The Declaratory Judgment Act provides, in pertinent part, "[i]n a case of actual

controversy within its jurisdiction . . . any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.

2201(a). "The existence of a 'case or controversy' is a condition precedent to the proper

exercise of judicial power by a federal court and the Declaratory Judgment Act cannot relax

that constitutional requirement." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153 (3d Cir.

1995). For its part, the ripeness doctrine "is at least partially grounded in the case or

controversy requirement" and "determines when a proper party may bring an action."

*Armstrong World Indus. Inc. by Wolfson v. Adams*, 961 F.2d 406, 411 n.12 (3d Cir. 1992).

"The function of the ripeness doctrine is to prevent federal courts 'through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Travelers Ins. Co.*, 72 F.3d at 1154 (quoting *Abbott Lab. v. Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)). Accordingly, courts look to the following three factors to determine the ripeness of "a declaratory judgment action: (1) the parties must have adverse legal interests; (2) the facts must be sufficiently concrete to allow for a conclusive legal judgment, and (3) the judgment must be useful to the parties." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006); *see also Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 507-08 (E.D. Pa. 2008).

As to the first factor, Defendants argue that the only indication that the parties' interests are adverse as to the damages provision is a statement in the March 8, 2016, letter in which Rio Tinto stated "we reserve our rights under the contract." (Doc. 18 at 17-18). There are two deficiencies with this argument. First, it is factually inaccurate. In Rio Tinto's letter dated March 31, 2016, Rio Tinto also stated that it was its "view that the $30 per ton is a penalty, being disproportionate to the loss [Plaintiff] would incur." (Doc. 1-17 at 15). Thus, Defendants have already expressed a view, albeit a preliminary one, that the damages provision is an unenforceable penalty. *See In re Plywood Co. of Pa.*, 425 F.2d 151, 155 (3d Cir. 1970) ("One way to contest a liquidated damage clause is to contend that a clause labeled 'liquidated damages' is in fact a 'penalty' and therefore void and unenforceable.")

Second, Defendants argument is legally inaccurate.  To say that the parties are not

legally adverse as to the damages provision in the contract—the damages provision that

Defendants have not conceded is enforceable—while simultaneously litigating the breach of

contract claim stemming from the same contract borders on a bad faith argument that

exceeds the bounds of zealous advocacy.  As the Third Circuit has observed:

> "For there to be an actual controversy the defendant must be so situated that
> the parties have adverse legal interests." 10A C. WRIGHT, A. MILLER & M.
> KANE, FEDERAL PRACTICE AND PROCEDURE § 2757, at 582–83 (2d ed.1983).
> Until the defendants are forced to decide whether or not to concede liability
> on the breach issue, they are not so situated.

*Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 648 (3d. Cir. 1990).  Here, Plaintiff

has brought a breach of contract action against Defendants and also sought a declaratory

judgment that the Amended Agreement's damages provision is enforceable.  Defendants

are now in a position to decide whether to concede liability on the breach of contract claim—

which would expose them to potential monetary liability under the damages provision—and

whether to concede that the damages provision of that same contract is enforceable.  Until

such a time that Defendants concede that the damages provision is enforceable, or until the

breach of contract litigation is resolved, their interests are adverse to Plaintiff's interests.

With regards to the second and third factors, Defendants argue that the Court cannot

give a conclusive legal judgment in this case because the facts are not concrete enough

yet, and, therefore, a declaratory judgment would not be helpful to the parties.  (Doc. 18 at

18; Doc. 20 at 14-15).  Specifically, Defendants argue that because the 2016 shipping

25

season is still open, Defendants may still buy coal during 2016, which, in turn, would render the damages provision inapplicable. (Doc. 18 at 18; Doc. 20 at 14-15). Even assuming this argument had merit, it is no longer factually accurate. As discussed in the prior section, the shipping season is "normally between March and November of each calendar year." (Doc. 1-11). At the time of this writing, the 2016 shipping season is closed. Thus, at this point, Defendants have either bought coal from Plaintiff in 2016 or they have not. Because neither party has notified the Court that Defendants have bought coal under the Amended Agreement, the Court must, at this point, assume they have not. Consequently, the Court rejects Defendants' argument.

In light of the above, Count V is currently ripe. Accordingly, the Court will deny Defendants' Motion to Dismiss Count V of Plaintiff's Complaint.

## V. CONCLUSION

For the reasons outlined above, this Court will deny Defendants' Motion to Dismiss, (Doc. 14), except as it pertains to Quebec Metal Powders LTD. A separate Order follows.

Robert D. Mariani
United States District Judge