## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEDDO COAL CO.,** | : | **Civil. No. 3:16-CV-621** |
| | : | |
| **Plaintiff** | : | **(Judge Mariani)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **RIO TINTO PROCUREMENT** | : | |
| **(SINGAPORE) PTD LTD., et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM ORDER

## I.     INTRODUCTION

This litigation, which presents itself as a relatively straightforward commercial dispute over coal contracts, has been mired in procedural delays and discovery disputes for a substantial time.

The case was first referred to the undersigned on January 31, 2018, to address what would be the first of several disagreements regarding case-management issues.  These matters have now grown to include disagreement over the proper scope of discovery; the designation of work-product protection and attorney-client privilege to shield documents from disclosure; the failure of the plaintiff to produce documents in a particular form that would preserve metadata in a particular format that the defendant specified; the appropriateness of the

defendants designating thousands of pages of documents as "attorney's eyes-only," which the plaintiff would be unable to share even with in-house counsel; whether the discovery limitations that the parties agreed to and proposed to the court to govern in this case would be binding; and, most recently, whether to extend the discovery and other pre-trial deadlines by a matter of months in order to allow the parties to complete discovery that has yet to be completed. The parties have identified and discussed their discovery dispute in a joint statement filed with the Court on March 9, 2018. (Doc. 60.) Subsequently, Rio Tinto filed a motion seeking an enlargement of the discovery and case-management deadlines, which Jeddo has opposed in part. (Doc. 61.)

In order to assist the parties, and to facilitate the continued progress of this litigation, we provide the following guidance and resolution of the outstanding discovery and scheduling issues as we understand them.

## II.    DISCUSSION

Rulings regarding the proper scope of discovery are matters consigned to the court's discretion and judgment. A court's decisions regarding the conduct of discovery will be disturbed only upon a showing of abuse of that discretion. Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion also extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter . . . , "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F. Supp. 501, 502 (E.D. Pa. 1996)). Under the standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 2735702, at *1 (D.N.J. Sept. 27, 2010).

Mindful of this broad discretion to resolve the current discovery disputes that have persisted in this litigation, and finding that resolution of those disputes and addressing scheduling issues relating to that discovery is necessary to the efficient resolution of parties' claims, we address each of the areas of conflict that the parties have identified.

## A.   <u>Attorneys'-Eyes Only</u>

In early 2018, Rio Tinto produced 5, 267 pages of documents to Jeddo, and designated 2,355 of these pages as "attorneys'-eyes only" ("AEO"). (Doc. 60, at 1.) The parties met and conferred regarding Rio Tinto's designation, and following that process Rio Tinto removed the AEO designation from a number of the documents. As it currently stands, there remain at least 1,140 pages of documents that are still designated AEO, though Rio Tinto explains that the total number of documents is far lower, since many of these documents are on spreadsheets that inflate the overall number of pages covered. The documents have been identified in summary fashion in an exhibit to the parties' joint statement. (Doc. 60, Ex. 1.) Rio Tinto contends that Jeddo's counsel should not be permitted to share and discuss the AEO documents even with Jeddo's in-house counsel, apparently because Rio Tinto understands that in-house counsel "wear[s] several hats" including "a business development hat." (Doc. 60, at 6.)

Rio Tinto defends its designation of these many pages of documents on the grounds that the information contained within them represents a kind of trade secret, even though much of the information seems to relate only to the coal prices agreed upon by Rio Tinto and its current trading partners. Nevertheless, Rio Tinto argues that if Jeddo's business team has access to this information it would give Jeddo an unfair competitive advantage "over Defendants and over Jeddo's

competitors related to the sales of coal because the documentation shows how much Defendants are paying for coal and the characteristics of that coal and how much Jeddo's competitors are charging clients for coal, the amount of coal those competitors are committed to providing, and the characteristics of that coal." (Doc. 60, at 7.) Rio Tinto attempts to analogize the price it pays for coal, and the suppliers with which it deals, to a pricing or customer list, which some courts have found to constitute trade secrets that may be subject to some measure of confidentiality in litigation.

Jeddo dismisses these concerns, arguing that the commercial information on these documents does not constitute a trade secret, and noting that Rio Tinto and Jeddo are not competitors and that it is extremely unlikely that the parties will be doing business again in the future. Even if they do, Jeddo maintains that nothing about this information could reasonably be expected to give either party an unfair advantage over the other, and that Rio Tinto would be free to decline to business with Jeddo if it found the terms of any hypothetical business relationship to be unfavorable.

Jeddo represents that the AEO issue is the most urgent of its discovery disputes with Rio Tinto. Jeddo argues that in order to prepare meaningfully for looming depositions, Jeddo's counsel needs to be able to talk with his client about "the many important documents that are still designated as AEO." (Doc. 60, at 2.)

Given counsel's interest in being able to confer with his client throughout the litigation, including about a substantial number of the documents Rio Tinto has produced; and because Jeddo contends that the AEO-designated documents should not be considered trade secrets in any event, Jeddo urges the Court to overrule Rio Tinto's efforts to prevent counsel from sharing these responsive materials with his in-house counterpart.

We agree with Jeddo that on the current record before us Rio Tinto's designation of these documents as AEO appears overly broad and insufficiently supported, and find that at minimum Jeddo's outside lawyers should be able to confer about the materials with in-house counsel and other Jeddo representatives to the extent necessary. Given what is now before us we disagree with Rio Tinto that the basic commercial information contained in the documents is so closely-held that it would be considered tantamount to a trade secret.

Under Rule 26(c)(7), a protective order may issue to protect trade secrets or other confidential research, development, or commercial information. Smith v. Bic Corp., 869 F.2d 194, 199 (3d Cir. 1989). The party seeking protection has the burden of showing that it is entitled to the protection sought. Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981). Establishing that a particular document is a trade secret requires specific showings, and the party seeking to shield potentially responsive information from disclosure as a trade secret faces a high burden.

<u>Bimbo Bakeries USA, Inc. v. Botticella</u>, 613 F.3d 102, 109-110 (3d Cir. 2010).

"Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking disclosure. The injury must be shown with specificity." <u>Publicker Indus., Inc. v. Cohen</u>, 733 F.2d 1059, 1071 (3d Cir. 1984). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning" will not establish good cause. <u>Cipollone v. Liggett Group, Inc.</u>, 785 F.2d 1108, 1121 (3d Cir. 1986).

Using this well-settled legal standard as our guide, we find that Rio Tinto simply has not demonstrated that basic pricing information relating to the cost of coal and related transactions, which is shared between Rio Tinto and its trading partners, is of such a commercially-sensitive nature that it deserves the stamp of confidentiality that would prevent counsel from communicating with his client about it.

Furthermore, although Rio Tinto has recently reduced the overall number of documents and pages that it would designate as AEO, that number is still substantial relative to the defendant's total document production, and in our view is excessive. Courts have expressed concern about over-designation of discovery production as AEO, particularly since it has the potential to keep the opposing party "in the dark about the important facts of the case." <u>Defazio v. Hollister, Inc.</u>, No. CIV S-04-1358, 2007 WL 2580633, at *1-2 (E.D. Cal. Sept. 5, 2007); <u>see also</u>

Election Systems & Software, LLC v. RBM Consulting, LLC, No. 8:1CV438, 2015 WL 1321440, at *5 (D. Neb. Mar. 24, 2015) (recognizing that the AEO designation "must be used sparingly and only when truly necessary because it limits the ability of the receiving party to view the relevant evidence, fully discuss it with counsel, and make intelligent litigation decisions."). Moreover, the use of AEO designations often is limited to cases where a party has demonstrated good cause for the designation by "articulating concrete and specific harms that would result from de-designation." Bobrick Washroom Equipment, Inc. v. Scranton Products, Inc., No. 3:14-CV-00853, 2017 WL 841286, at *1 (M.D. Pa. Mar. 3, 2017) (Mariani, J.).

In this case, we do not find that Rio Tinto has met this exacting standard for showing good cause to restrict the plaintiff's in-house counsel and other representatives assisting in this case from reviewing the documents in order to coordinate Jeddo's litigation strategy. As described by the parties, the documents themselves do not clearly appear to be trade secrets and, equally significantly, the parties seem to agree that Jeddo and Rio Tinto are no longer business competitors, and thus any arguable risk posed by sharing this information with in-house counsel appears especially limited, if it exists at all. Rather, as reported by the parties, the documents appear to contain information reflective of Rio Tinto's assessment of the coal market, and concerns information regarding prices and profits, and Rio

Tinto's business decisions regarding the amount of coal to purchase and the suppliers of that coal. We find that this information is potentially relevant to the claims and defenses in this case, and do not find that Rio Tinto has articulated "concrete and specific harms" that would result from counsel reviewing these documents with Jeddo's in-house lawyer and other representatives who may be necessary.

Moreover, we believe that any potential for misuse of arguably sensitive information contained within these documents may effectively be addressed by requiring that any Jeddo representative assisting counsel in this matter to treat the information as confidential and use it only in connection with this litigation. Accordingly, Jeddo's request for entry of an Order de-designating the AEO materials produced will be granted, subject to the requirement that any Jeddo counsel or representative maintain this information in confidence and use it only in connection with the claims and defenses in this litigation.

### B. Attorney-Client Privilege and Work-Product Designations

In its February 16, 2018 letter to the Court, Jeddo challenged Rio Tinto's assertion of the work-product doctrine over documents pre-dating February 18, 2016, arguing that these documents could not possibly be subject to work-product protection because Rio Tinto could not reasonably have anticipated litigation before that time. Jeddo also challenged Rio Tinto's assertion of the attorney-client

privilege over communications that appeared to be between non-attorney employees and over documents that, in Jeddo's view, were inadequately described in RioTinto's privilege log. On March 8, 2018, Rio Tinto provided Jeddo with an updated redaction log and privilege log, and declined to remove any of its redactions or privilege designations. Jeddo continues to maintain that the redacted or withheld material should be ordered produced, since it constitutes neither work product nor privileged communications.

### 1. The Legal Framework: Attorney-Client Privilege and Attorney Work-Product

The United States Court of Appeals for the Third Circuit has summarized the purposes of, and distinctions between, the attorney-client privilege and the work-product doctrine, and the importance of limiting recognition of evidentiary privileges when necessary to achieve their purposes, as follows:

> Though they operate to protect information from discovery, the work-product doctrine and the attorney-client privilege serve different purposes. The purpose behind the attorney-client privilege is "'to encourage clients to make full disclosure of facts to counsel so that he may properly, competently, and ethically carry out his representation. The ultimate aim is to promote the proper administration of justice.'" In re Impounded, 241 F.3d 308, 316 (3d Cir. 2001) (quoting In re Grand Jury Proceedings, 604 F.2d 798, 802 (3d Cir. 1979)). The work-product doctrine, by contrast, "promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against

their clients." Westinghouse Elec. Corp. v. Republic of the Phil., 951 F.2d 1414, 1428 (3d Cir. 1991) (citations omitted).

> Though evidentiary privileges have important purposes, their recognition may result in the withholding of relevant information and so may obstruct the search for truth. Indeed, the protections are effective only if they shield relevant evidence and thus they necessarily obstruct the search for the truth at a trial at which they are recognized either implicitly or explicitly. Consequently, privileges should be recognized only when necessary to achieve their respective purposes. See Fisher v. United States, 425 U.S. 391, 403 (1976).

In re Chevron Corp., 633 F.3d 153, 164 (3d Cir. 2011).

### a.      The Attorney-Client Privilege

The attorney-client privilege is meant to facilitate "full and frank communication between attorneys and their clients." Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007). The privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn v. United States 449 U.S. 383, 389 (1981). The privilege "applies to any communication that satisfies the following elements: it must be '(1) a communication (2) made between [the client and the attorney or his agents] (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'" In re Teleglobe Communications Corp., 493 F.3d 345, 359 (3d Cir. 2007) (quoting the Restatement (Third) of the Law Governing Lawyers § 68 (2000)). Thus, the privilege reaches

"[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." Fisher v. United States, 425 U.S. 391, 403 (1976); see also In re Ford Motor Co., 110 F.3d 954, 965 n.9 (3d Cir. 1997) (communication made by client and an attorney are privileged if made "for the purpose of securing legal advice."); United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980).

The privilege applies both to information that the client provides to the lawyer for purposes of obtaining legal advice, as well as to the advice the attorney furnishes to the client. To this end, the Supreme Court has explained that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn, 449 U.S. at 390. However, the privilege extends only to the disclosure of the communications, and does not extend to disclosure of the underlying facts conveyed in those communications. Id. at 385.

While recognizing the value served by the privilege, courts must also be mindful that the privilege obstructs the truth-finding process and should therefore be "applied only where necessary to achieve its purpose." Wachtel, 482 F.3d at 231; see also Westinghouse Elec. Corp., 951 F.2d at 1423. Therefore, because the purpose of the privilege is to protect and promote the "dissemination of sound legal advice," it applies only to communication conveying advice that is legal in nature, as opposed to where the lawyer is providing non-legal, business advice. Wachtel,

482 F.2d at 231; see also Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 152 F.R.D. 132, 137 (N.D. Ill. 1993) (stating that the privilege is inapplicable where the legal advice is incidental to business advice); Hardy v. New York News, Inc., 114 F.R.D. 633, 643 (S.D.N.Y. 1987) ("The attorney-client privilege is triggered only by a client's request for legal, as contrasted with business advice . . . .").

Federal courts are further required to assess the application of the privilege on a case-by-case basis. Thus, "Rule 501 [of the Federal Rules of Evidence] requires the federal courts, in determining the nature and scope of an evidentiary privilege, to engage in the sort of case-by-case analysis that is central to common-law adjudication." Id. at 230; see also Upjohn, 449 U.S. at 386, 396-97; In re Processed Egg Prods. Antitrust Litig., MDL No. 2002, 08-md-2002, 2011 U.S. Dist. LEXIS 120708, at *10-11 (E.D. Pa. Oct. 19, 2011). In addition, the party asserting the privilege bears the burden of providing that it applies to the communication at issue. In re Grand Jury, 603 F.2d 469, 474 (3d Cir. 1979).

### b.    The Work-Product Doctrine

The work-product doctrine is embodied within Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial" unless otherwise discoverable or a party shows substantial need for the material. Fed. R. Civ. P. 26(b)(3). The doctrine recognizes that a lawyer requires

a "certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Hickman v. Taylor, 329 U.S. 495, 511 (1947).

The doctrine thus is intended "to protect material prepared by an attorney acting for his client in anticipation of litigation." United States v. Rockwell Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990); see also United States v. Nobles, 422 U.S. 225, 238 (1975) ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."). The doctrine does not extend to protect documents that were prepared "in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes.'" Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260 (3d Cir.1993) (quoting Fed. R. Civ. P. 26(b)(3) advisory committee note).

In order for the doctrine to apply, Rule 26(b)(3) requires "that the material be prepared in anticipation of some litigation, not necessarily in anticipation of the particular litigation in which it is being sought." In re Ford Motor Co., 110 F.3d 954, 967 (3d Cir. 1997) (emphasis omitted). It is not necessary that litigation has been commenced or even threatened before a document can be found to have been prepared in anticipation of litigation. See In re Processed Egg Prods. Antitrust Litig., MDL No. 2002, 08-md-2002, 2011 U.S. Dist. LEXIS 120708, at *16 (E.D. Pa. Oct. 19, 2011) (citing Hydramar, Inc. v. Gen. Dynamics Corp., 115 F.R.D. 147,

150 n.3 (E.D. Pa. 1986)).  However, documents will come within the scope of the work-product doctrine only where the documents were prepared primarily in anticipation of future litigation.  See In re Diet Drugs Prods. Liability Litig., MDL No. 1203, 2001 U.S. Dist. LEXIS 5494, 2001 WL 34133955, at *5 (E.D. Pa. Apr. 19, 2001).

### 2. Rio Tinto's Work-Product Designation

Rio Tinto represents that it engaged its in-house counsel in September of 2015 to advise the company of issues related to what it describes as "an approach to Jeddo concerning the Variation Agreement."  (Doc. 60, at 18.)  In a nutshell, it appears that Rio Tinto came to realize that due to market conditions, it would need either concessions from Jeddo on their existing agreements, or it could wind up facing legal action from Jeddo who might seek legal remedies on the grounds that Rio Tinto had breached the parties' agreement.  Rio Tinto represents that in-house counsel became involved in order to advise the business team regarding the legal and litigative consequences that were likely to flow in response to the business decisions that were under consideration at that time.  Rio Tinto has offered to submit a sworn declaration from in-house counsel attesting to this fact, if the Court deems it necessary.  (Doc. 60, at 19 at n.4.)

In its letter to the Court, and in its section of the parties' joint statement, Jeddo insists that Rio Tinto could not possibly have reasonably anticipated

litigation prior to February 18, 2016, since it was only then that Jeddo had raised the prospect of litigation. Jeddo maintains that prior to that time, and as reflected in a letter from Rio Tinto to Jeddo dated December 18, 2015, the parties had engaged in nothing more than an invitation to discuss revisions to the existing contract. In short, Jeddo urges the Court to find that prior to February 18, 2016, Rio Tinto was simply engaged in business negotiations and was endeavoring to persuade Jeddo to consider making concessions to the existing contract. Rio Tinto disagrees, noting that in the months leading up to February 18, 2016, Rio Tinto's business team and lawyers were engaged in strategic planning regarding not merely business matters, but what they anticipated – correctly – was likely to be litigation if Rio Tinto rejected their proposal.

Upon consideration, the Court finds that Rio Tinto has persuasively shown that in the months shortly preceding Jeddo's letter raising the prospect of litigation, the company was working with its in-house lawyers to prepare for a potential lawsuit in light of the decisions it was faced with in terms of a contract that had become unfavorable. The defendant has consistently maintained that the correspondence flagged as protected work-product was prepared in coordination with counsel specifically because it reasonably anticipated the potential for a lawsuit with Jeddo, which occurred shortly after Rio Tinto took the steps of inviting discussions to address the very issue that inspired the company to involve

its in-house lawyer to assist in making strategic decisions based on the potential for litigation. Although Jeddo is right that litigation was plainly foreseeable as of February 18, 2016, since litigation was actually raised as a possibility in that letter, this does not mean that Rio Tinto was unreasonable in anticipating litigation could arise prior to that time given the decisions it was facing. Accordingly, we find that Rio Tinto has adequately explained and justified its use of the work-product designation for the withheld documents, and will not require that they be disclosed.

### 3. Rio Tinto's Attorney-Client Privilege Claim

Turning to Jeddo's challenge to the documents withheld as attorney-client privileged, we do not find that the parties have sufficiently explained the basis for Jeddo's challenge or Rio Tinto's defense of the privilege in the joint statement. Although Jeddo did raise a number of arguments in its February 16, 2018 letter to the Court (Doc. 57), it did not expound upon those arguments in the joint statement or even incorporate them by reference, other than to propose that the Court undertake a limited *in camera* review of up to 20 documents to make a judgment about whether Rio Tinto's attorney-client privilege designations were appropriate. Rio Tinto insists that its designations were adequately explained, are fully justified and should be honored, representing that all of the communications at issue involved clients of Rio Tinto's in-house counsel – in other words, Rio Tinto's employees or consultants who had been retained to assist the company.

While we acknowledge and appreciate the representations of Rio Tinto's counsel, in order to have a more substantial basis upon which to rule on this issue, the Court will agree to Jeddo's proposal to identify up to 20 documents for Rio Tinto to submit to the Court for *in camera* review.[1]   Following review of those documents, the Court will issue a separate Order ruling on whether Rio Tinto's invocation of the attorney-client privilege as a basis to withhold the documents from production was appropriate.[2]

## C.    Limitations on Requests for Production

The next issue concerns the number of requests for production ("RFP") that Jeddo served upon Rio Tinto.  The parties agree that Jeddo initially served Rio Tinto with 36 RFP, and on February 18, 2018, Jeddo served an additional four requests.  This number exceeded the 25-request limit that the parties recommended to the District Court in their Joint Case Management Plan.  The parties agree that Judge Mariani did not expressly impose a limit on requests for production in the Case Management Order that was issued.  The parties have met and conferred on this issue, with Jeddo requesting that Rio Tinto agree to a limit of 45 RFP, which is

---

[1]   To the extent these documents are emails that are part of a longer email chain, Rio Tinto will also submit to the Court for *in camera* inspection a copy of the email that contains the complete chain to the extent any such email also appears on Rio Tinto's privilege log.

[2]   Rio Tinto may also provide a cover letter or other document that explains the basis for the privilege and identifies the persons who are party to the communications.

five more than the current number of requests served, and 20 more than the parties proposed originally. Rio Tinto has refused to agree to a number of RFP greater than 25.

The parties' positions can be simply stated: Jeddo maintains that because Judge Mariani did not specify a limit on the number of RFPs that could be served, there are no limits on this form of discovery. Rio Tinto contends that the parties should be bound by their joint recommendation to the Court, which really was in the nature of an agreement that should now be honored and enforced. We agree with Rio Tinto.

As an initial matter, we disagree with Jeddo's argument that because the District Court did not include an express limitation on the number of RFPs, either party was free to disregard the limits it agreed to. The rules governing joint case management plans make it clear that in making recommendations to the district court, the parties are to submit an agreed-upon number, and if they cannot agree, they should offer competing proposals. See, e.g., Rule 26(f) Report (Doc. 27), 4.5 ("(where the parties cannot agree, set forth separately the limits . . . .)"); Fed. R. Civ. P. 26(f)(2) (parties are to confer "for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plain."). Thus, in submitting the proposed case-management plan to the Court, and submitting a jointly agreed-upon limit on

RFPs, Jeddo and Rio Tinto were by definition representing that they were in agreement on this limitation.

Moreover, Rule 29 permits parties to enter into stipulations, including about discovery. <u>See</u> Fed. R. Civ. P. 29 (allowing the parties to "stipulate that . . . (b) other procedures governing or limiting discovery be modified . . . ."). The Rule is intended to give the parties "greater opportunity . . . to agree upon modifications to the procedures governing discovery or to limitations upon discovery." <u>Id.</u>, 1993 Notes. The Rules, therefore, support the parties' efforts to come to agreements regarding the conduct of discovery in federal court.

Finally, courts in the Middle District of Pennsylvania routinely have found that "agreements in joint case management plans entered into by counsel" are enforceable. <u>See, e.g.</u>, <u>Dolfi v. Disability Reinsurance Mgmt. Servs., Inc.</u>, 548 F. Supp. 2d 709, 728 (M.D. Pa. 2008); <u>Fisher v. Marquip, Inc.</u>, No. 3:CV-99-1976, Order at 3 (M.D. Pa. Sept. 26, 2002) (Dkt. Entry 116). Rio Tinto has cited to multiple decisions from other courts outside of the Third Circuit where parties' agreed-upon limitations to discovery have likewise been found to be enforceable, providing further support to Rio Tinto's position here. (Doc. 60, at 14-16.) These decisions are in line with <u>Dolfi</u> and <u>Fisher</u>, and rest on the straightforward proposition that the parties' agreements with respect to the conduct of discovery should be honored.

Because we find that the parties agreed that RFPs would be capped at 25, Jeddo's service of an additional 15 RFPs without leave of Court or agreement by Rio Tinto contravened the parties' prior agreement, and was improper. Accordingly, we will not require Rio Tinto to respond to RFP Nos. 26-40.[3]

### D.    Enlargement of the Case-Management Deadlines

The most recent dispute in this case concerns Rio Tinto's motion to extend the case-management deadlines, including the deadlines governing discovery. Jeddo opposes the motion in part, arguing that even if the discovery deadline is extended all other deadlines should remain in place.  Although we recognize Jeddo's interest in moving this case forward, it is clear to the Court that any extension of discovery deadlines, which we find is necessary here, will also necessitate enlarging the remaining deadlines as well.

Fact discovery is currently set to end in two weeks, on April 19, 2018.  In its motion, Rio Tinto represents that in addition to the discovery issues being resolved in this Order, additional discovery issues are likely to be brought to the Court's attention, although counsel are working to explore resolution of some of those

---

[3]   To the extent Jeddo has a particular need for the discovery sought in these RFPs, the plaintiff may move for leave to take some additional discovery upon a showing of good cause.  The plaintiff has not made that showing here, but has merely argued that it should be permitted to serve as many as 40 or 45 RFPs simply because the District Court did not specify any limits in the case-management order. In the absence of some showing, however, the Court is unwilling to allow Jeddo to go beyond the limits that it agreed to when it proposed the initial discovery limitations to the Court.

issues without Court intervention.[4]  The parties both indicate a desire to take additional depositions, and the instant Order will impose discovery obligations on the parties, and involve the Court in an *in camera* review of certain documents over which Rio Tinto claimed privilege.  In short, the parties will need additional time to complete discovery; it is prudent to enlarge the remaining deadlines as well which may be affected by what the parties learn in discovery; and we do not find that Jeddo will be prejudiced by moving all pre-trial deadlines back by 60 days.

## III.  <u>ORDER</u>

Accordingly, for the reasons discussed above, IT IS HEREBY ORDERED THAT:

1.  <u>**Attorneys'-Eyes Only.**</u>  Because the Court does not find that Rio Tinto has demonstrated that its use of the AEO designation was appropriate or necessary, Jeddo shall be permitted to share the AEO-designated documents with in-house counsel and other Jeddo representatives as may be necessary, provided

---

[4]  It appears that at least some of these potential discovery issues involve Jeddo's compliance with Rio Tinto's demand that it produce documents in particular electronic format, with metadata.  Rio Tinto expounds on this issue in its reply brief in further support of the motion to extend deadlines, (Doc. 63), but there is nothing before the Court at this time requesting resolution of this particular dispute.  We note only that this appears to be a point of ongoing contention for the parties, and the Court stands ready to assist them if they are unable to come to a mutually agreeable resolution of the matter.  However, because the Court will be enlarging all deadlines in this case, the parties are urged to continue their efforts to hammer out a compromise solution to this particular dispute before turning to motions practice.

that counsel and any Jeddo representative reviewing any document identified as AEO treats the document as confidential and for use only in connection with this litigation.

2. **Work-Product.** Rio Tinto's designation of certain potentially responsive documents as work product was appropriate, and Rio Tinto will not be required to produce these documents to Jeddo.

3. **Attorney-Client Privilege.** With respect to Rio Tinto's designation of certain documents as subject to attorney-client privilege, Jeddo shall review Rio Tinto's privilege log and identify up to 20 documents to be submitted to the Court for *in camera* review. To the extent these documents are emails that are part of a longer email chain, Rio Tinto will also submit to the Court for *in camera* inspection a copy of the email that contains the complete chain to the extent any such email also appears on Rio Tinto's privilege log. Jeddo shall identify the documents on or before **Friday, April 13, 2018**. Rio Tinto shall thereafter submit those documents to the Court, together with any explanatory cover letter, by **Friday, April 20, 2018**.

4. **Limits on RFP**. The Court finds that the parties agreed that requests for production would be limited to 25 per side, and this agreement is enforceable regardless of the fact that the Case-Management Order did not contain express limitations. Therefore, Rio Tinto is not obligated to respond to RFP Nos. 26-40.

To the extent Jeddo has a particular need for the discovery sought in these RFPs, the plaintiff may move for leave to take some additional discovery upon a showing of good cause.

5.      **Revised Case-Management Deadlines.**     The motion to extend discovery deadlines (Doc. 61) is GRANTED since Court agrees that good cause has been shown to enlarge all case-management deadlines by 60 days. Accordingly, the new deadlines are as follows:

a.      Fact discovery – June 15, 2018;

b.      Expert reports – July 16, 2018;

c.      Expert response reports – July 30, 2018;

d.      Supplemental reports – August 13, 2018;

e.      Expert discovery – 60 days after last report is submitted; and

f.      Dispositive motions – 60 days after period for expert depositions expires.

So ORDERED this 5th day of April, 2018.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge